UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SUSAN and PATRICK STOLL, MARY and | ) | |
| CHARLES BOWLES, individually and on | ) | |
| behalf of all persons similarly situated, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:09-cv-0364-TWP-DML |
| | ) | |
| vs. | ) | |
| | ) | |
| KRAFT FOODS GLOBAL, INC. | ) | |
| | ) | |
| Defendant. | | |

ENTRY ON DEFENDANT'S MOTION TO DISMISS, OR IN THE ALTERNATIVE, TO
STAY THESE PROCEEDINGS

This matter is before the Court on Defendant Kraft Foods Global, Inc.'s ("KFG") Motion

to Dismiss the First Amended Class Action Complaint, or in the Alternative, to Stay these

Proceedings.   This class-action lawsuit arises out of soil, groundwater, and air contamination

attributable to KFG's corporate predecessor.   In a previous ruling, this Court granted Plaintiffs'

Motion for Class Certification.

Currently, KFG is working with U.S. EPA to complete investigative and remedial

activities.   Based on this fact, KFG argues that the primary jurisdiction doctrine applies, and, as

such, the Court should dismiss or stay Plaintiffs' causes of action until U.S. EPA determines that

investigative and remedial activities at the site in question are substantially complete.   KFG also

urges dismissal and/or a stay on a variety of other grounds, all premised on the fact that the site of

the contamination is subject to an ongoing clean-up order under the supervision and oversight of

U.S. EPA.   Specifically, KFG argues that: (1) Plaintiffs failed to establish the existence of an

imminent and substantial endangerment, as required for their RCRA claim; (2) Plaintiffs' request

for injunctive relief is moot; and (3) Plaintiffs' common law claims are preempted by RCRA to the extent they seek injunctive relief.   For the reasons set forth below, KFG's Motion to Dismiss the First Amended Class Action Complaint, or in the Alternative, to Stay these Proceedings [Dkt. 48] is DENIED in its entirety.

## I.   BACKGROUND

This lawsuit centers around environmental pollution emanating from historical operations at the 20-acre Radio Materials Corporation ("RMC") site in Attica, Indiana (the "Site"). Activities at the Site generated potentially hazardous chemicals, including trichloroethylene ("TCE") and tetrachloroethylene ("PCE").   It is undisputed that these contaminants have migrated off-Site.

### A.    *History of Ownership of the Site*

In 1948, Joseph Riley, Sr.'s company RMC began manufacturing television tubes and ceramic capacitors at the Site.   In 1957, P.R. Mallory & Company, Inc. ("Mallory") purchased the Site and continued operations until 1978, when RMC repurchased the Site.   RMC continued to make ceramic capacitors at the Site until September 2001 when, in the wake of financial problems, it ceased all manufacturing activities.   In the meantime, in 1980, through a series of mergers and acquisitions, Mallory became a wholly-owned subsidiary of KFG.[1]   For purposes of this lawsuit, KFG is alleged to be Mallory's successor in interest, and thus liable for the contamination attributable to Mallory from its operations at the Site.

_____

[1]In 1988, KFG sold Mallory to Duracell Holdings Corp.

**B.**      ***Environmental Concerns at the Site***

At their core, Plaintiffs allegations are that Mallory disposed of and released various

hazardous substances, including TCE and PCE, into the environment from the Site, resulting in

contamination of nearby residential properties.   Indeed, in the past decades, manufacturing

activities at the Site have come under scrutiny from environmental authorities, apparently with

good reason.   From 1981 to 1997, the Indiana Department of Environmental Management

conducted a series of Site inspections, which uncovered numerous violations, primarily related to

the storage and disposal of hazardous materials.   RMC first notified KFG about such problems in

1989, when RMC's President wrote a letter to KFG's General Counsel "serv[ing] notice" about

"potential environmental pollution problems." It is unclear if KFG ever responded to this letter.

A decade later, in 1999, following a U.S. EPA preliminary assessment, the EPA issued an

order ("EPA Order")   pursuant to its authority under 42 U.S.C. § 6928(h) of the Resource

Conservation and Recovery Act ("RCRA").   The parties bound by the EPA Order include RMC,

"its officers, directors, employees, agents, successors and assigns, heirs, trustees, receivers, and

upon all persons, including but not limited to contractors, acting on behalf of [RMC]."   The EPA

Order established numerous objectives for RMC, including:

- To perform interim measures at the Facility to relieve threats to human health
  and/or the environment;

- To perform an investigation to determine fully the nature and extent of any release
  of hazardous waste at or from the Site;

- To perform a "Corrective Measures Study" to identify and evaluate alternatives for
  the corrective measures necessary to prevent, mitigate, and/or remediate any
  releases of hazardous wastes at or from the Site;

- To implement the corrective measure or measures selected by U.S. EPA at the Site;

3

• To perform any other activities necessary to correct or evaluate actual or potential threats to human health and/or the environment resulting from the potential release of hazardous waste at or from the Site.

**C.      KFG's Role in Investigatory & Remedial Activities at the Site**

Following the issuance of the EPA Order, RMC hired an environmental consultant to investigate conditions at the Site.   However, RMC was in a precarious financial state, with insufficient assets to meet its outstanding obligations.   Ultimately, as a result, RMC discontinued its manufacturing activities in September 2001.   Because compliance with the EPA Order was obviously expensive, on April 27, 1999, shortly after the issuance of the EPA Order, RMC requested that KFG enter into an agreement to reimburse RMC for a portion of the investigation and remediation costs it had already incurred and to contribute financially toward compliance with the EPA Order going forward.   It is unclear whether or not KFG directly responded to this request.

Over two years later, on July 25, 2001, RMC once again sought out KFG's financial help, sending a similar letter.   Apparently, this entreaty was more effective.   On October 2, 2002, KFG entered into an agreement (the "Agreement") with RMC, under which KFG agreed to "provide financial and implementation assistance . . . in completing certain investigatory and remedial activities at and about the RMC facility in Attica."   As a term of the Agreement, however, "[KFG] shall have no compliance responsibility with respect to the Order whether through this Agreement or otherwise."   Further, through the Agreement, KFG retained discretion to delineate the scope of its work: "Nothing herein shall obligate [KFG] to implement or incur costs for any investigatory and/or remedial work at the Attica facility which [KFG] concludes, in its sole discretion, is not technically necessary or appropriate."   Finally, KFG reserved its right to terminate the

4

Agreement: "[T]his Agreement shall terminate once Kraft has completed work which it has determined, in its sole discretion, is necessary to bring environmental conditions created during the time period of 1957 to 1978 into compliance with applicable State and Federal law . . ."   Under any standard and from any perspective, KFG is not an actual party to the EPA Order.

Pursuant to the Agreement, KFG hired a consulting firm, Conestoga-Rovers & Associates ("CRA"), to investigate and remediate the environmental conditions at the Site.   CRA completed an investigation of the Site, including soil and groundwater sampling.   In doing so, CRA identified numerous areas of contaminated soil and a groundwater plume migrating in a northwesterly direction from the Site.   Based on these problems, KFG implemented numerous measures.   By July of 2008, KFG had completed the following:

- Expansion of the scope of groundwater investigation to delineate the horizontal and vertical extent of groundwater impacts from the Site;

- Excavation and off-Site disposal of approximately 350 tons of lead-impacted soil;

- Injection of chemical oxidants into the soil to treat volatile organic compound "hot spots";

- Installation and startup of soil vapor extraction systems to clean up soil affected by volatile organic compounds;

- Excavation, consolidation, and placement of approximately 700 tons of soil affected by volatile organic compounds.

Additionally, because the groundwater in the vicinity of the Site is relatively shallow, U.S. EPA also expressed concerns about the potential for vapor intrusion into homes near the Site. Therefore, KFG and CRA conducted a soil vapor investigation and developed a vapor intrusion assessment plan and study area.   In mid-2007, KFG obtained soil gas samples from the residential

area northwest of the Site.[2]   As more results were obtained, the size of the vapor intrusion study

area increased.   Specifically, an area northwest of the Site was deemed an area of interest for

potential vapor intrusion, and more in-depth sampling was completed.   In relevant part, KFG's

March 2008 "Vapor Intrusion Mitigation System Installation Work Plan" states, "Previous

sampling results show that . . . soil gases in areas down gradient of the RMC facility have

detectable concentrations of [PCE] and [TCE]."

      In an August 2008 letter, KFG formally notified Plaintiffs about the contamination.   In

relevant part, KFG's consultant wrote:

> Data collected as part of Site investigations indicate that certain
> chemicals related to historical industrial activities are present in soil
> and groundwater on and near the RMC property.   The main
> chemicals detected are known as volatile organic compounds (VOCs)
> . . . Under certain conditions, the VOCs present in the soil and
> groundwater may result in the potential for vapors to accumulate in
> enclosed indoor spaces

---

[2]Initially, KFG selected a single home to test: that of RMC's President Riley, which was
tested in August 2005.   According to Plaintiffs, KFG did not engage in further testing until 2007,
when two other homes owned by the Riley family were tested.   More expansive testing did not
occur until 2008.

Ultimately, after more sampling results were received, KFG, in consultation with U.S. EPA, agreed to install temporary vapor mitigation units in approximately 125 homes.   Moreover, KFG made efforts to reimburse property owners for any potential additional utility costs associated with the operation of these vapor mitigation units.

**D.       *Current Status of Remediation Efforts***

On April 20, 2009, KFG submitted a "Groundwater Interim Corrective Measures Work Plan" to minimize migration of contaminated groundwater from the Site.   U.S. EPA commented on the plan, and KFG is in the process of responding to those comments.   If this plan is approved, KFG will fund the installation and operation of a groundwater treatment system.   Moreover, KFG continues to install vapor mitigation units in homes within the vapor intrusion study area while it works with U.S. EPA to explore more permanent remedies to address these indoor air issues. These are, however, interim measures.   Although over a decade has elapsed since the EPA Order was issued, final corrective measures – including the preparation of a Corrective Measures Study – have not yet been approved, let alone implemented.

**E.       *Plaintiffs Complaint***

In March 2009, Plaintiffs filed the present class action lawsuit.   The class consists of all persons and non-governmental entities that own residential property or reside on property located within specified geographic boundaries in Attica, Indiana, signifying the area that has been impacted or threatened by contaminants emanating from the Site (the "Class Area").   This class includes approximately 129 homes and more than 200 individuals.   Plaintiffs have asserted five legal claims against KFG: (1) negligence, (2) private nuisance, (3) trespass, (4) willful and wanton

misconduct, and (5) a claim under § 6972(a)(1)(B) of RCRA.   In addition to an array of damages, Plaintiffs also seek injunctive relief in the form of an order restraining and enjoining KFG from allowing continued contamination of the Class Area, and compelling KFG to abate the contamination it has caused in the Class Area.

## II.   LEGAL STANDARDS

KFG seeks to dismiss each count of Plaintiffs' First Amended Class Action Complaint, due to the Court's lack of subject matter jurisdiction over these claims.   Alternatively, KFG argues that portions of Plaintiffs' First Amended Class Action Complaint fail to state a claim upon which relief can be granted.   Given the nature of KFG's Motion, two legal standards apply.

### A.   *12(b)(1) Subject Matter Jurisdiction*

KFG invokes the primary jurisdiction doctrine to argue that each count of Plaintiffs' First Amended Class Action Complaint should be dismissed pursuant to Fed.R.Civ.P. 12(b)(1), which allows a party to move to dismiss claims if the court lacks subject matter jurisdiction.[3]  When reviewing a 12(b)(1) motion, "The Court is not bound to accept as true the allegations of the complaint which tend to establish jurisdiction where a party properly raises a factual question concerning the jurisdiction of the district court to proceed with the action." *First Nat'l Bank of Chicago v. Steinbrink*, 812 F. Supp. 849, 852 (N.D. Ill. 1993) (quoting *Grafon Corp. v. Hauserman*, 602 F.2d 781, 783 (7th Cir. 1979)) (internal quotations omitted).   Therefore, a

---

[3]As an alternative to its Fed.R.Civ.P. 12(b)(1) argument, KFG seeks to stay and/or strike all or portions of Plaintiffs' claims and/or requests for relief under Fed.R.Civ.P. 12(f).   However, given the Court's ruling, the Court need not address the applicability of Fed.R.Civ.P. 12(f).

complaint's allegations "must be considered in conjunction with all other evidence submitted on the issue of subject matter jurisdiction." *Id*. (citation omitted).   Finally, "any conflict in the evidence submitted must be viewed in light of the fact that the party invoking jurisdiction carries the ultimate burden of presenting competent factual proof of proper subject matter jurisdiction." *Id*. (citation and internal quotations omitted).

### B.      *12(b)(6) Failure to State a Claim*

When reviewing a 12(b)(6) Motion, the Court takes all well-pleaded allegations in the complaint as true and draws all inferences in favor of the plaintiff. *Bielanski v. County of Kane*, 550 F.3d 632, 633 (7th Cir. 2008).   However, the allegations must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests" and the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (2007)). Additionally, the Court may take judicial notice of matters of public record without converting a 12(b)(6) motion into a motion for summary judgment. *Henson v. CSC Credit Services*, 29 F.3d 280, 284 (7th Cir. 1994).   Courts within the Seventh Circuit have found that such matters of public record can include consent decrees, such as the EPA Order in this matter. *See, e.g., Muniz v. Rexnord Corp.*, No. 04-C-2405, 2004 WL 2011393, at *3 (N.D. Ill. Sept. 3, 2004).

### III.   DISCUSSION

The linchpin of KFG's argument is that the primary jurisdiction doctrine applies, and, as such, the Court should dismiss or stay Plaintiffs' causes of action until U.S. EPA determines that investigative and remedial activities at the site in question are substantially complete.   KFG also

urges dismissal and/or a stay on other grounds, arguing that: (1) Plaintiffs failed to establish the existence of an imminent and substantial endangerment required for their RCRA claim; (2) Plaintiffs' request for injunctive relief is moot; and (3) Plaintiffs' common law claims are preempted by  RCRA to the extent they seek injunctive relief.   Each argument is addressed separately below.

### A.    KFG's Primary Jurisdiction Argument

KFG argues that "[u]nder the doctrine of primary jurisdiction, this Court should abstain from second-guessing U.S. EPA's decisions and either dismiss without prejudice or stay all or portions of this case to allow these remedial activities to proceed under the expert oversight of U.S. EPA." [Dkt. 49 at 17].   "The doctrine of primary jurisdiction allows a federal court to refer a matter extending beyond the 'conventional experiences of judges' or 'falling within the realm of administrative discretion' to an administrative agency with more specialized experience, expertise, and insight." *Leib v. Rex Energy Operating Corp.*, No. 06-cv-802-JPG-CJP, 2008 WL 5377792, at *14 (S.D. Ill. Dec. 19, 2008) (quoting *In re Star-Net, Inc.*, 355 F.3d 634, 639 (7th Cir. 2004)).

If a court chooses to exercise primary jurisdiction, "it does not dismiss the litigation but stays it pending the results of the agency's resolution of the issue, and the action resumes after the agency's decision if that decision has not resolved the entire controversy." *Id*. (citing *Baker v. IBP, Inc.*, 357 F.3d 685, 688 (7th Cir. 2004)).   There are several strong policy reasons for applying primary jurisdiction: (1) it promotes consistency and uniformity, particularly where the development of the law is dependent upon administrative policy; (2) administrative agencies are uniquely qualified to handle certain complex areas outside of the conventional expertise of courts; and (3) it serves judicial economy because, if a dispute is fully resolved by an agency, the court

need not intervene. *Ryan v. Chemlawn Corp.*, 935 F.2d 129, 131 (7th Cir. 1991).

**1.      Analysis of Factors**

The Seventh Circuit has adopted a case-by-case approach for determining the

appropriateness of the primary jurisdiction doctrine. *Id.*   Moreover, courts may weigh numerous

factors in making this determination, including:

> (1) whether the Court is being called on to decide factual issues not
> within the conventional experience of judges; question at issue is one
> within the conventional experience of judges; (2) whether the
> Defendants could be subjected to conflicting orders of both the Court
> and the administrative agency; (3) whether relevant agency
> proceedings have actually been initiated; (4) whether the agency has
> demonstrated diligence in resolving the issue or has instead allowed
> the issue to anguish; and (5) whether the Court can fashion the type
> of relief requested by the plaintiff.

*Wilson v. Amoco Corp.*, 989 F. Supp. 1159, 1169 (D. Wyo. 1998) (citing *Friends of Santa Fe*

*County v. LAC Minerals, Inc.*, 892 F. Supp. 1333, 1349-50 (D.N.M. 1995)).   Contrary to KFG's

contentions, however, application of these factors does not support a dismissal or stay of Plaintiffs'

claims.

**a.      The Court's Conventional Experience**

Plaintiffs ask the Court for injunctive relief in the form of an order restraining and

enjoining KFG from allowing continued contamination of the Class Area, and compelling KFG to

abate the contamination it has caused in the Class Area.   KFG stresses that in order to do this, the

Court must engage in a taxing and complex analysis outside of its conventional experience.

Therefore, supported by non-binding authority, KFG argues that the Court should defer to U.S.

EPA because it is far better equipped to resolve these environmental issues. *See, e.g.,*

*Schwartzman, Inc. v. Atchinson, Topeka & Santa Fe Ry. Co.*, 857 F. Supp. 838, 842 (D.N.M.

1994).

KFG's argument is well-taken.   Admittedly, the Court does not confront esoteric environmental issues on a daily basis.   This fact, however, is not a sufficient basis for denying jurisdiction.   KFG instead must show that "courts in general lack the competence to efficiently and effectively resolve the issue." *College Park Holdings, LLC v. Racetrac Petroleum, Inc.*, 239 F. Supp. 2d 1322, 1328 (N.D. Ga. 2002) (citing *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 532 F.2d 412 (5th Cir. 1976)); *see also New Orleans Pub. Serv. Inc. v. Council of City of New Orleans*, 491 U.S. 350, 359 (1989) (noting that the federal courts' obligation to adjudicate claims within their jurisdiction is "virtually unflagging").   As evidenced by the creation of a private right of action under § 6972(a)(1)(B) of RCRA, Congress has signaled its view that the subject matter of this lawsuit is well within the Court's domain.   What is more, Congress has explicitly stated that federal courts can handle such matters: "Enforcement of pollution regulations is not a technical matter beyond the competence of the courts." *College Park Holdings,* LLC, 239 F. Supp. 2d at 1328 (quoting S.Rep. No. 92-414, *reprinted in* 1972 U.S.C.C.A.N. 3668, 3747).

At bar, KFG does not challenge that Plaintiffs have properly invoked their RCRA claim. Where, as here, the requirements for a citizen suit under § 6972 have been satisfied, the Seventh Circuit has admonished courts not to allow an "end-run" of the RCR – stressing that Congress has *specified* when an individual suit is available under the RCRA. *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 619 (7th Cir. 1998); *see also DMJ Associates, LLC v. Capasso*, 228 F. Supp. 2d. 223, 229-30 (E.D.N.Y. 2002) ("By authorizing citizens to file private lawsuits under RCRA and narrowly defining the conditions under which state or federal action can circumscribe that right, Congress clearly signaled that federal courts have a duty to hear and decide these claims and carefully limited the deference courts should pay to the expertise of an administrative agency."); *Trident Inv. Mgmt., Inc. v. Bhambra*, No. 95-C-4260, 1995 WL 736940, at *2   (N.D. Ill. Dec. 11,

12

1995) (observing that most courts have found that the primary jurisdiction inapposite to RCRA).

Given the overall statutory scheme of RCRA and the controlling case law, the Court is loath to

embrace the primary jurisdiction doctrine under the circumstances.   Doing so would amount to an

abdication of Congressionally-vested responsibility.

### b.    The Potential for Conflicting Orders

KFG next emphasizes that if the Court decides this case, it may have to direct KFG to

engage in specific remediation.   According to KFG, such a ruling could conflict with the EPA's

directives made pursuant to the EPA Order: "If the Court were to entertain plaintiffs' case, U.S.

EPA and this Court could develop conflicting opinions, resulting in conflicting orders and

obligations that would significantly interfere with the ongoing remediation which would in turn

have a detrimental effect on plaintiff." [Dkt. 49 at 22].   This argument is anchored in the notion

that "[t]he RMC Site is already the subject of the EPA Order which governs the Site's

remediation." *Id*.   While technically true, this statement does not tell the whole story.

KFG, after all, is not a party to the EPA Order – only RMC is.   KFG's only concrete

connection to the RMC Site is its Agreement with RMC, in which it expressly disavowed any

relationship to the EPA Order.   The following statements, quoted verbatim from the Agreement,

are illustrative:

- Kraft shall have no compliance responsibility with respect to the Order whether through this Agreement or otherwise.

- Kraft shall have no obligation . . . to undertake work or incur costs associated with environmental conditions at the Attica property due to operations either before or after that time period.

- Nothing herein shall obligate Kraft to implement or incur costs for any investigatory and/or remedial work at the Attica facility which Kraft concludes, in its sole discretion, is not technically necessary or appropriate.

13

Backed by some support, KFG counters that although it is not a party to the EPA Order *per se*, it is effectively bound by it, making it a de facto party.   Regardless, right now, KFG is not an actual party to the EPA Order, meaning the EPA Order is not legally enforceable against KFG.   Despite its contentions to the contrary, KFG is akin to a *voluntary* participant.   *See Spillane v. Commonwealth Edison Co.*, 291 F. Supp. 2d 728, 734 (N.D. Ill. 2003) (rejecting primary jurisdiction argument and emphasizing that defendant was participating in voluntary program); *City of Waukegan v. Arshed*, No. 08-C-2657, 2009 WL 458621, at *2 (N.D. Ill. Feb. 23, 2009) (rejecting application of primary jurisdiction doctrine where defendants were proceeding under a voluntary program with the Illinois Environmental Protection Agency).   Thus, the nature of KFG's participation – which is arguably voluntary – obviates concerns relating to the potential for conflicting or duplicative orders.

Moreover, assuming *arguendo* that KFG was an actual party to the EPA Order, this factor would still not cut decisively in KFG's favor.   Significantly, it is not a "foregone conclusion that any order of this Court will interfere or actually conflict with the orders of the EPA."   *Wilson*, 989 F. Supp. at 1170.   After all, "The likelihood of conflict can be . . . reduced if the Court considers carefully the agencies' previous and contemplated orders before it orders any relief itself and permits agency comment prior to finalizing any order." *Id.*   By eliciting the expertise of the involved agency while listening to any proposed orders, the Court is confident that it can fashion a non-conflicting remedy.

### c.      Whether Relevant Agency Proceedings Have Been Initiated

KFG maintains that this "most important" factor weighs decisively in its favor because U.S. EPA action is ongoing and addressing the same contamination at issue in Plaintiffs' First Amended Class Action Complaint.   Once again, however, this argument ignores the fact that

KFG is not an actual party to the EPA Order.   As discussed, right now, KFG is arguably akin to a voluntary participant.   The fact that U.S. EPA is heavily engaged in the remediation process does not override this fact.

### d.       Whether the Agency has Demonstrated Diligence

In its analysis of this factor, KFG emphasizes that it has been a diligent and compliant partner of U.S. EPA – completing numerous investigations, creating a comprehensive set of work plans, and continually keeping U.S. EPA apprised of its status.   The Court does not question KFG's diligence or the significance of its completed measures.   Moreover, the Court understands that although the EPA Order was issued roughly eleven years ago, some of the delay stems from RMC's financial troubles.   Nevertheless, the fact remains: the EPA Order was issued *eleven* years ago, and final corrective measures have yet to be developed, let alone effectuated.   While these matters are often protracted, KFG cannot persuasively argue that this factor trumps the others.

### e.       Whether the Court Can Fashion the Relief Requested

As discussed above, the Court is confident it can fashion the relief requested, even if it will require some command of scientific and technical issues.   Congress, after all, has vested the Court with this duty.   As some courts have astutely observed, "There is an additional, overriding reason for courts to hear RCRA . . . cases despite their supposed unique nature: Congress has told us to." *Wilson*, 989 F. Supp. at 1170.   Given Congress' directive, the ability of the Court to fashion non-conflicting orders with input from experts, and the fact that KFG is not technically a party to the EPA Order, the Court is unwilling to divest itself of jurisdiction and defer entirely to U.S. EPA.

## 2.      KFG's Unripeness Argument

Under the umbrella of the factor relating to whether the Court can fashion the relief requested, KFG argues that because remediation is incomplete, damages cannot be calculated with

sufficient certainty, and therefore, "Plaintiffs' damages claims should . . . be dismissed (without prejudice) or stayed until such time as remedial activities are substantially completed." [Dkt. 49 at 27].   According to KFG, because remediation of the site is not yet complete, Plaintiffs lack a "ripe, justiciable" claim.   In making this argument, KFG relies heavily on  *Allgood v. General Motors Corp.*, No. 1:02-cv-1077-DFH-TAB, 2006 WL 2669337 (S.D. Ind. Sept. 18, 2006), where the court held that "because the evidence essential to the elements of a post-remediation stigma claim for damages cannot be determined at this time, the issue . . . is not ripe for resolution." *Id.* at *37.

At this time, KFG's argument is unpersuasive.   First, as KFG itself concedes, the primary jurisdiction doctrine cannot be used to dismiss or stay claims seeking recovery of monetary damages. *Feikema v. Texaco, Inc.*, 16 F.3d 1408, 1417-18 (4th Cir. 1994); *Schwartzman*, 857 F. Supp. at 843 ("Courts refuse to defer jurisdiction if the plaintiff is seeking damages for injury to property or person, as this is the type of relief courts routinely consider . . .").   Second, given the current procedural posture of this case, this argument is premature.   KFG has brought a Motion to Dismiss, to be viewed using a Fed.R.Civ.P. 12(b)(1) or 12(b)(6) standard.   However, to make a damages determination, not only would the Court have to analyze whether or not Plaintiffs can establish their damages in an adequate fashion, but also whether or not remediation efforts have been "substantially completed." *See Pflanz v. Foster*, 888 N.E.2d 756, 760 (Ind. 2008).

Unlike the court in *Allgood*, this Court has yet to hear a shred of evidence about the concreteness or speculativeness of Plaintiffs' damages. *See Allgood,* 2006 WL 2669337, at * 35-37 (dismissing claims without prejudice on motion for partial summary judgment *after* considering evidence from plaintiffs' damages expert, in part because "the data needed to avoid sheer guesswork simply are not available, or at least have not been presented and considered.").

16

Unquestionably, *Allgood* viewed the plaintiffs' claim seeking stigma property damages through a summary judgment lens: "[P]laintiffs have not supported the claim with evidence that would allow a reasonable jury to find such a stigma or to determine damages other than by speculation." *Id*. at *2.   Thus, at this juncture, it is too early for the Court to make an *Allgood*-style determination.

**B.    KFG's Imminent and Substantial Endangerment Argument**

KFG next argues that Plaintiffs' RCRA claim under § 6972(a)(1)(B)    fails as a matter of law because there is an ongoing, government-directed remediation.   To make out a prima facie case under RCRA, a plaintiff must allege: "(1) that the defendant has generated solid or hazardous waste, (2) that the defendant is contributing to or has contributed to the handling of this waste, and (3) that this waste may present an imminent and substantial danger to health or the environment." *Spillane*, 291 F. Supp. 2d 728, 736 (N.D. Ill. 2003) (quoting *Albany Bank & Trust Co. v. Exxon Mobil Corp.*, 310 F.3d 969, 972 (7th Cir. 2002)).   The first two elements are not at issue here; the question is whether the third is sufficiently alleged.

For this third element, "Imminence does not require an existing harm, only an ongoing threat of future harm." *Id*. (citations and internal quotations omitted).   Moreover, imminence "implies that there must be a threat which is present *now*, although the impact of the threat may not be felt until later." *Id*. (citations and internal quotations omitted).   In their First Amended Class Action Complaint, Plaintiffs allege, "The releases from the Facility present an imminent and substantial endangerment to health and the environment as defined in RCRA."   In light of the fact that these allegations must be taken as true for purposes of a motion to dismiss, Plaintiffs have made the requisite pleading.

As for KFG's contention that its involvement with the EPA Order removes any "imminent

and substantial danger," the fact that the remediation is ongoing does not moot the issue of endangerment. *Spillane*, 291 F. Supp. 2d at 736.   Moreover, the cases KFG relies upon are inapposite.   As Plaintiffs note, KFG cites only one case decided on a Rule 12 motion to dismiss – *CKM Partners v. Phillips Petroleum Co.*, No. 00-C-6529, 2002 WL 554514 (N.D. Ill. April 12, 2002) – and that case is easily distinguished.   In *CKM Partners*, the pleadings established that remediation at the site was completed, as evidenced by the "No Further Remediation" letter issued by the Illinois Environmental Protection Agency. *Id*. at *1.   Noting this, the court held, "The NFR letter issued by the IEPA regarding this contamination moots [the plaintiff's] claims for declaratory or injunctive relief." *Id*.   Here, U.S. EPA has issued no such letter, and for good reason – final remedial measures have not even been selected.   Accordingly, it would be premature for the Court to dismiss Plaintiffs' RCRA claim on this basis.

## C.     KFG's Mootness Argument

KFG next argues that Plaintiffs' request for injunctive relief is moot and should be dismissed because "[t]here is no injunctive relief available to plaintiffs that is not already being required by U.S. EPA." [Dkt. 49 at 30].   By extension, KFG contends that the EPA Order already provides the relief that Plaintiffs seek.   The Court is not persuaded for three reasons.

First, once again, KFG's argument ignores the reality that it is not an actual party to the EPA Order, and therefore, it is unclear what U.S. EPA can require KFG to do.   RMC is the only party expressly bound by the EPA Order, and given its moribund state, it is not likely to assist in future remediation efforts in a meaningful fashion.

Second, the two cases KFG relies upon to bolster its argument – *87th St. Owners Corp. v. Carnegie Hills-87th St. Corp.*, 251 F. Supp. 2d 1215 (S.D.N.Y. 2002) and *Kara Holding Corp. v.*

18

*Getty Petroleum Mktg, Inc.*, No. 99-Civ-0275(RWS), 2004 WL 1811427 (S.D.N.Y. Aug. 12, 2004) – are procedurally and substantively distinguishable.   Procedurally, both cases involved summary judgment motions, turning on an assessment of the parties' evidence.   Here, by contrast, KFG is asking the Court to dispose of Plaintiffs' claim at the motion to dismiss stage without affording Plaintiffs the opportunity to specify precisely what injunctive relief they are seeking. Substantively, both cases involved completed or nearly completed remediation projects.   In *87th St. Owners Corp.*, "the actions that allegedly created the danger [were] in the past," "there [was] nothing to restrain," and "plaintiff [was] unable to describe a single action that defendant could be ordered to take to reduce or eliminate any risk its past actions may have caused, that is not already being undertaken." 251 F. Supp. 2d at 1219.   Similarly, in *Kara Holdings Corp.*, 2004 WL 1811427, the court recognized that because "the agency charged with overseeing . . . remediation has found that the systems currently in place are sufficient to abate the danger," no further action was necessary. *Id.* at *12.   Here, by contrast, final remedial measures have not yet been approved and Plaintiffs have not yet been afforded the opportunity to present a proposed remediation plan.

        Third, the cases cited by Plaintiffs, although not precisely on-point, are more persuasive. In *Morris v. Primetime Stores of Kansas, Inc.*, No. 95-1328-JTM, 1996 WL 563845 (D. Kan. Sept. 5, 1996), defendants moved for summary judgment partially on the basis of a mootness argument. *Id*. at *3.   Observing that a remedial plan was "being developed" and that an ultimate report was "currently under review," the court rejected defendant's argument because defendants had not demonstrated that "the relief which will be granted is so complete and so definite that it renders any relief this court may order under RCRA a nullity."   *Id*. at *3-4; *see also Lambrinos v. Exxon Mobil Corp.*, No. 1:00-CV-1734, 2004 WL 2202760, at *2, 6-7 (N.D.N.Y. Sept. 29, 2004) (denying summary judgment and rejecting mootness argument where environmental agency had

not begun a remediation scheme, even though it had "managed the investigation, continued assessment of the problem and outlined potential remediation techniques.").   Here, no final remediation plan has been approved, meaning any forthcoming relief is indefinite and certainly incomplete.   Consequently, it would be inappropriate for the Court to grant KFG's motion to dismiss on mootness grounds at this time.

### D.     KFG's Preemption Argument

Finally, employing similar reasoning, KFG argues that Plaintiffs' common law claims seeking injunctive relief are preempted by RCRA: "Any order from this Court that provides the injunctive relief requested by plaintiffs as part of their common law claims will necessarily impact the on-going efforts to remediate the RMC Site pursuant to the EPA Order, thereby creating an impermissible conflict between the EPA Order and any such resulting order from this court." [Dkt. 49 at 32].

To buttress this argument, KFG relies almost exclusively on *Feikema v. Texaco, Inc.*, 16 F.3d 1408 (4th Cir. 1994).   In *Feikema*, defendant argued that because plaintiffs' state law actions for nuisance and trespass sought injunctive relief, they would conflict with a Consent Order between U.S. EPA and defendant. *Id*. at 1415.   Because of this inevitable conflict, defendant argued, any state remedies were preempted by the Consent Order. *Id*.   The Consent Order in *Feikema* – issued pursuant to 42 U.S.C. § 6973 –   *required* defendant to implement certain immediate remedial measures and to implement a plan under an EPA-approved schedule. *Id*. at 1411, 1416.   Ultimately, the Fourth Circuit held that to the extent the plaintiffs' claims sought injunctive relief, they were preempted by the U.S. EPA's Consent Order. *Id*. at 1416.   In doing so, the court reasoned that under the circumstances, "the injunctive relief requested by the [plaintiffs]

20

from the court would conflict with remedial measures selected and supervised by the EPA." *Id.*
According to the Fourth Circuit's logic, if the court were to order the relief plaintiffs requested, it
would be substituting its own judgment for the EPA's and it would be usurping the EPA's review
role pursuant to 42 U.S.C. § 6973. *Id.*

KFG's argument, albeit well-formulated, is not persuasive under the specific
circumstances at hand.   For one, in *Feikema*, the defendant was an actual party to the Consent
Order. *Id.* at 1411.   As the court has repeated *ad nauseum*, KFG is not an actual party to the EPA
Order, meaning that, right now, it is questionable what exactly U.S. EPA can legally order KFG to
do.   Thus, despite KFG's contentions to the contrary, a court order would not necessarily conflict
with the strictures of the EPA Order.   Undoubtedly, the former can legally order KFG to
remediate; arguably, the latter cannot.

Second, KFG's argument runs contrary to RCRA's statutory framework.   In *Feikema*, the
Consent Order was issued pursuant to § 6973, which gives the EPA broad powers to remedy
imminent hazard situations.   Pursuant to § 6972(b)(2)(B)(i), suits under § 6972(a)(1)(B) – like the
one at bar – are precluded if the EPA has commenced and is diligently prosecuting an action under
§ 6973.   Thus, the *Feikema* plaintiffs were ineligible to bring individual citizen suits under
RCRA.   The EPA Order, by contrast, was issued pursuant to   § 6928(h), which does not serve as
a bar to individual citizen suits.   Plaintiffs are therefore eligible to bring a claim under §
6972(a)(1)(B).   So, unlike the Consent Order in *Feikema*, the EPA Order does not preclude
Plaintiffs' RCRA claim and Plaintiffs are not required to defer to U.S. EPA on this claim.   Since
Plaintiffs are not required to defer to U.S. EPA on their RCRA claim, it would make little sense to
require them to defer to U.S. EPA for their state common law claims that seek virtually identical
injunctive relief.

This conclusion is further reinforced by the language of § 6972(f), which provides: "Nothing in this section shall restrict any right which any person . . . may have under any statute or *common law* to seek enforcement of any standard or requirement relating to the management of solid waste or hazardous waste, or to seek any other relief." 42 U.S.C. § 6972(f) (emphasis added). Quite clearly, Congress sought to preserve state common law actions under § 6972. Moreover, the fact that KFG is not a party to the EPA Order obviates concerns about conflicting orders. At bottom, the Plaintiffs' common law claims are not preempted to the extent they seek injunctive relief.

## IV. CONCLUSION

For the reasons noted herein, the Court DENIES KFG's Motion to Dismiss the First Amended Class Action Complaint, or in the Alternative, to Stay these Proceedings [Dkt 48] in its entirety.

SO ORDERED.

Dated:  09/06/2010


Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution attached.

22

Distribution to:

Norman B. Berger
VARGA BERGER LEDSKY HAYES & CASEY
nberger@vblhc.com

Cory Stephen Brundage
cb@brundagelaw.com

Shawn M. Collins
THE COLLINS LAW FIRM, P.C.
smc@collinslaw.com

Philip L. Harris
JENNER & BLOCK LLP
pharris@jenner.com

Michael D. Hayes
VARGA BERGER LEDSKY HAYES & CASEY
mhayes@vblhc.com

Robert Srader Hulett
HACKMAN HULETT & CRACRAFT LLP
rhulett@hhclaw.com

Edward J. Manzke
THE COLLINS LAW FIRM, P.C.
ejmanzke@collinslaw.com

Aaron W. Rapier
THE COLLINS LAW FIRM, P.C.
arapier@collinslaw.com
Steven M. Siros
JENNER & BLOCK LLP
ssiros@jenner.com

Ellen Morrison Townsend
HACKMAN HULETT & CRACRAFT LLP
etownsend@hhclaw.com